[Cite as *State v. Greene*, 2024-Ohio-2804.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,           :

                                    No. 112931

    v.                               :

TERENCE GREENE,                            :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, VACATED IN PART
                  AND REMANDED
**RELEASED AND JOURNALIZED:**  July 25, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652481-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Steven N. Szelagiewicz, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Terence Greene, appeals his convictions for rape, sexual battery, felonious assault, kidnapping, gross sexual imposition and disseminating matter harmful to juveniles after a jury trial. For the reasons that

follow, we affirm the judgment, in part, vacate it, in part, and remand this matter for a limited resentencing hearing.

## I. Factual Background and Procedural History

{¶ 2} In September 2020, a Cuyahoga County Grand Jury returned a 74-count indictment charging Terence Greene with multiple counts of rape, sexual battery, felonious assault, kidnapping, gross sexual imposition and disseminating matter harmful to juveniles. Most of the counts included either or both sexual-motivation and sexually violent predator specifications under R.C. 2941.147(A) and 2941.148(A). We identify all the charges and specifications, as well as their dispositions, in an appendix attached to this opinion.

{¶ 3} The State's theory of the case was that Greene sexually assaulted eight teenaged students over the course of two decades, while Greene was a dance teacher at the Cleveland School of the Arts ("CSA") and at Cuyahoga Community College ("Tri-C"). Several of the assaults occurred after Greene tested positive as a carrier of human immunodeficiency virus ("HIV"). Greene denied the allegations and pointed out that the State presented no DNA evidence or medical or psychological records to corroborate the alleged victims' testimony.

{¶ 4} The case proceeded to trial on May 15, 2023. Greene elected to have the sexually violent predator specifications tried to the bench. The remaining charges and specifications were tried to a jury. The State presented 12 witnesses in its case in chief. We refer to the alleged victims by their initials in this opinion — R.A., N.S., E.P., S.R., R.C., J.B., A.W. and D.T.

**A. Stipulations**

{¶ 5} The parties stipulated that Greene is HIV-positive. He received his diagnosis on July 21, 2004, and has been in treatment for the condition since that time.

{¶ 6} The parties also stipulated that in the summer of 2020, several of the eight alleged victims filed a civil lawsuit asserting claims related to the same assault allegations as raised in this criminal case.

**B. The State's Case**

**1. The Examination of R.A.**

{¶ 7} R.A. testified that he was born in December 1992. He attended the CSA from the eighth grade to the eleventh grade. He entered the school's music program but quickly grew interested in dance. He participated in an afterschool dance group, where male students and male dancers from outside the school rehearsed together and performed at various events in the community. Greene was the school's dance instructor.

{¶ 8} While R.A. was in the eighth grade, he expressed to Greene an interest in switching into the dance program. Greene explained what garments R.A. would need in order to make the transition into the program.

{¶ 9} There came a point in the ninth grade that, after a dance rehearsal, Greene asked R.A. to accompany him into a dressing room to take measurements. In the dressing room, Greene asked R.A. to remove his pants. R.A. did so, believing that was necessary to be fitted with a dance belt. Greene began groping R.A.'s

genitals "and like . . . playing with my genitals in his hand." Greene asked R.A. "if I liked that." R.A. did not respond, put his clothes back on and left the dressing room. "[E]verything went back to normal" for a time.

{¶ 10} Several days or weeks later, Greene approached R.A. again and asked him to accompany him into the dressing room. In the dressing room, Greene performed oral sex on R.A. R.A. estimated that he was 13 or 14 years old at the time.

{¶ 11} On another occasion while R.A. was in the ninth grade, Greene asked R.A. to accompany him to Greene's house "to help him with costumes." R.A. estimated this was approximately a year after the first instance of oral sex. Greene drove R.A. to his house and took him through a back door and downstairs into a basement. Greene told R.A. that he was going to be a great dancer and then proceeded to "come on to me," whispering flirtatiously. Greene "ended up getting me to pull my pants down, and he performed oral sex on me . . . ."

{¶ 12} Encounters like these continued throughout R.A.'s time at CSA. He estimated that there were over 20 incidents, of which he remembered the details of about six.

{¶ 13} On cross-examination, R.A. admitted that he never told anyone about these encounters at the time; he did not tell his family and he did not report the incidents to school administrators or the police. He further admitted that he worked with Greene again at Tri-C several years after leaving the CSA. They also worked together on several dance programs when R.A. was an adult.

{¶ 14} Finally, R.A. admitted that the first time he went to the police to report these incidents was on June 30, 2020. He was accompanied by a lawyer who ultimately filed a civil lawsuit against the Cleveland Metropolitan School District on R.A.'s behalf. R.A. initially testified that his lawyer was not in the room with him when he spoke with the detective but defense counsel played portions of the recorded interview and the lawyer was present for the duration of the interview.

{¶ 15} On redirect, R.A. said the civil lawsuit is no longer pending. On recross-examination, R.A. admitted that the lawsuit had been settled for millions of dollars.

## 2. The Examination of Gerald Paul Cox II

{¶ 16} Gerald Paul Cox II testified that he is employed at Tri-C as the dean of creative arts. Tri-C operates a dance academy for students aged five to 18. Tri-C hired Greene in October 2015 as a part-time dance instructor in that program. He was made a full-time employee in 2017 and continued working at Tri-C until January 2020. Most of his students were in high school.

{¶ 17} Cox confirmed that J.B. (identified by name in the testimony but by initials here) was a student in the dance program sometime between 2015 and 2020 while Greene was an instructor in the program.

{¶ 18} On cross-examination, Cox admitted that Greene was a gifted dance teacher. Cox often saw Greene interacting with students and never witnessed any inappropriate interactions.

### 3. The Examination of D.T.

{¶ 19} D.T. testified that he was born in January 1992. D.T. attended the CSA from eighth grade through twelfth grade, from 2006 through graduation in 2010. D.T. met Greene when D.T. auditioned for the dance program at the school, in the eighth grade. D.T. was accepted into the dance program, through which he took dance classes during the school day and also participated in afterschool dance activities.

{¶ 20} There came a time in approximately 2009 that D.T. and R.A. asked Greene to help them develop choreography. D.T. and R.A. were waiting for Greene in the dance room when Greene asked R.A. to accompany him into a dressing room. They were alone in the dressing room for a long time. Greene exited and asked D.T. to accompany him into the dressing room. In the dressing room, D.T. said that Greene "asked me to show him my private part . . . ." D.T. refused. Greene then worked with D.T. and R.A. on their choreography.

{¶ 21} Later that day, D.T. asked Greene for a ride to a rehearsal at a local church. Greene agreed but drove D.T. to his house first. D.T. said the house was "[s]omewhere in the Warrensville area" of Cuyahoga County. They went inside and D.T. asked for something to eat. Greene agreed but also said "[D.T. was] going to have to . . . do something for him because he has treated [D.T.] to something to eat." Greene brought a laptop into the kitchen and told D.T. that D.T. would advance in his dance career "if [D.T.] did something for him." Greene played pornography on the laptop and undressed himself and D.T. Greene then touched D.T.'s genitals with

his hand and asked D.T. to penetrate him, copying what was in the pornography. D.T. penetrated Greene's anus with his penis. The act lasted about ten minutes and Greene told D.T. "that he doesn't want anybody to like know what's going on . . . ." Greene then drove D.T. to the church for rehearsal. In dance class the next day, D.T. told another student — N.S. — about the incident. N.S. did not believe D.T.

{¶ 22} D.T. continued in the dance program until his graduation in 2010. There were no further incidents with Greene.

{¶ 23} On cross-examination, D.T. admitted that a lawyer accompanied him to the police station to give a statement about Greene; that was the first time that D.T. discussed Greene with the police. D.T. never reported the incident with Greene to any school administrators or to his family. The lawyer who accompanied him to the police station filed a lawsuit on D.T.'s behalf against the school district.

### 4. The Examination of N.S.

{¶ 24} N.S. testified that he was born in March 1991. He attended the CSA from 2003, when he was in sixth grade, through his graduation in 2010. Greene became N.S.'s dance teacher when N.S. was in the seventh grade. N.S. participated in dance classes during the day and participated in the afterschool dance group led by Greene. Greene and N.S. grew very close during this time.

{¶ 25} There came a time in approximately May 2008 that N.S. accompanied Greene to Greene's home to put music on a compact disc for a dance program. Greene invited N.S. to the basement to watch a movie — "Noah's Arc: Jumping the Broom." As the movie began playing, Greene rubbed N.S.'s leg with his hand and

asked N.S. "like, what I was into, like, you know, sexually." Greene then "start[ed] grabbing like closer to my private area." N.S. told Greene that he was very uncomfortable and requested a ride home. Greene drove him part of the way home and N.S. walked the rest of the way.

{¶ 26} N.S. described the movie as rated "R" but said "it wasn't like a pornographic movie." He only watched about 20 minutes of the movie on that day, but he has seen the movie since. The plot of the movie involves a student having sexual intercourse with a teacher.

{¶ 27} N.S. did not tell anyone about this incident at the time. He posted about the incident on the social-media site Facebook in 2020 and later filed a lawsuit against the school district.

{¶ 28} On cross-examination, N.S. admitted that online information about "Noah's Arc: Jumping the Broom" stated that the movie was released in October 2008. However, he said that he was sure that Greene played the movie for him in May 2008.

{¶ 29} N.S. further admitted that he continued participating in the dance program at the CSA after this incident and, after graduating, came back to guest teach at the school. N.S. also took trips to Pittsburgh, Daytona and Denver for various dance programs after the incident, despite knowing that Greene would be at those programs, too. After graduating, he posted a video to the social-media website Youtube in which he praised Greene as a father figure and a teacher.

{¶ 30} Finally, N.S. admitted that the lawyer in the civil lawsuit accompanied N.S. to an interview with police investigators.

### 5. The Examination of C.W.

{¶ 31} C.W. testified that she is the mother of J.B., who was born in May 2002. J.B. attended the CSA for three years, graduating when he turned 18 years old. J.B. participated in the dance program at the school and also danced at Tri-C after school. C.W. understood that Greene was teaching dance at Tri-C.

{¶ 32} There came a time in J.B.'s eleventh-grade year that he became withdrawn and angry and expressed a desire to quit dance. C.W. came to learn that something happened through the course of the dance program that made him want to quit.[1] He never went back to dance.

### 6. The Examination of J.B.

{¶ 33} J.B. testified that he was born in May 2002. He attended the CSA from August 2018, during his eleventh-grade year, through graduation in May 2020. He had been dancing at Tri-C after school since he was 14 years old. Greene taught the afterschool dance program and came to be like a father to J.B.

{¶ 34} There came a time in October 2019 (when J.B. was 17 years old) that Greene took a few of the dancers out for pizza. Greene offered J.B. a ride home. As they were getting into his car, Greene offered to teach J.B. a new dance in Greene's

---

[1] The trial court sustained objections to a line of questioning about the details of what J.B. said happened.

basement. J.B. agreed, because he needed to learn the dance in order to participate in an upcoming dance conference.

{¶ 35} Greene took J.B. to his basement and took off J.B.'s dance tights. Greene performed fellatio on J.B., made J.B. perform fellatio on him and Greene penetrated J.B.'s anus with his penis. Greene then drove J.B. home and told him not to tell anyone about the encounter.

{¶ 36} J.B. was diagnosed with HIV in March 2020. J.B. believes that he contracted the condition from Greene.

{¶ 37} On cross-examination, J.B. admitted that he did not tell anyone about the assault until January 2020. He did not go the hospital after the assault. He had been sexually active with another male student in 2016 or 2017. On redirect, he testified that he knows he did not contract HIV from this relationship because he was being regularly tested for communicable diseases at the time.

### 7. The Examination of E.P.

{¶ 38} E.P. testified that he was born in February 1995. E.P. attended the CSA from middle school, approximately the sixth grade, through the tenth grade. He estimated that he was 11 or 12 years old when he started at that school. He transferred to a different school during his tenth-grade year. He was a music major but transferred into a photography program. As a photography major, he often photographed dance classes for school programming materials. Many of his friends were dancers and he came to be seen as a "bonus member" of the dance class.

{¶ 39} When E.P. was in the ninth grade (14 or 15 years old), Greene offered him the opportunity to assist with costume design for the dance performances because E.P. was interested in fashion and costume design. Greene would also drive E.P. home when it was cold outside.

{¶ 40} Greene began making sexual comments to E.P. around this time. He would say things like, "[Y]our penis looks big in those pants" and "[Y]ou look too mature to be a boy." He asked to "taste" E.P.'s penis and asked E.P. to allow him to see his penis.

{¶ 41} There came a day when Greene offered to drive E.P. home but drove past his street. When E.P. questioned him, Greene said he needed to quickly stop by his own house. E.P. said he believed the house was in the "Richmond area," either "Richmond Heights or off Richmond Road." E.P. accompanied Greene inside and Greene led him to his bedroom. Greene began to undress E.P. and offered him "poppers," which he described as an inhalant drug "like nail polish remover or VHS cassette tape cleaner." Greene proceeded to fondle E.P.'s genitals and buttocks before performing oral sex on E.P. and penetrating E.P.'s anus with his fingers and penis. Greene then drove E.P. home.

{¶ 42} At home, E.P. attempted to die by suicide; he took a number of pills that he believed would cause him to die. His mother rushed him to the emergency room, where his stomach was pumped with charcoal to counteract the medication.

{¶ 43} A few months later, Greene told E.P. (still 14 or 15 years old) in a school dressing room that he wanted to have sex with E.P. again. Greene drove E.P.

to his house and again led him to the bedroom. Greene performed oral sex on E.P. and E.P. performed oral sex on Greene. Greene asked E.P. to penetrate Greene's anus, and E.P. did so. Greene then drove E.P. home.

{¶ 44} There came a time when E.P. was in the tenth grade that Greene invited E.P. into a dressing room at the school. Greene blocked the door, groped E.P. through his clothes and then performed oral sex on him. E.P. went home after that encounter and told his parents that he wanted to transfer schools.

{¶ 45} E.P. was diagnosed as HIV-positive two days before his eighteenth birthday. At that time, he had only had penetrative sex with Greene.

{¶ 46} E.P. did not report these encounters at the time. He later made a post on Facebook stating vague details about his encounters with Greene.

{¶ 47} E.P. then contacted a lawyer and, together with other victims, filed a lawsuit against the school district.

{¶ 48} On cross-examination, E.P. admitted that investigators never asked him to provide medical records from the emergency room, substantiating his suicide attempt. He further admitted that, before the second encounter, E.P. voluntarily walked to Greene's car to be driven to Greene's house; Greene did not physically force him to get into the car.

### 8. The Examination of S.R.

{¶ 49} S.R. testified that he was born in July 1984. He attended high school at the CSA, graduating in 2003. He participated in dance classes and an afterschool dance program, both taught by Greene.

{¶ 50} There came a time that Greene asked S.R. if he was "gay." On another occasion, while S.R. was in the eleventh grade (he estimated that it was 2002), Greene and S.R. discussed S.R.'s sexuality at Greene's house. Greene asked to see S.R.'s penis. Greene performed oral sex on S.R. and S.R. performed oral sex on Greene. Greene also penetrated S.R.'s anus with his penis. S.R. described this encounter as an "out-of-body experience"; he participated because he felt it was a necessary step to him becoming a professional dancer.

{¶ 51} When S.R. expressed that he was attracted to women, Greene gave him "a VHS porno tape," which showed men having sex with women.

{¶ 52} S.R. performed oral sex on Greene multiple times while S.R. was in high school, at Greene's request.

{¶ 53} S.R. was initially involved in the lawsuit against the school district, but he was "dropped" because of the statute of limitations.

{¶ 54} On cross-examination, S.R. admitted that he first spoke to law enforcement about Greene in June or July of 2020. While he spoke with several therapists about these encounters with Greene, he did not know if investigators asked for any records of those conversations.

### 9. The Examination of Andrew Koonce

{¶ 55} Andrew Koonce testified that he is employed as an academic superintendent with the Cleveland Metropolitan School District. He met Greene in the "early 2000s" when Greene was an artist-in-residence in the dance program at the school.

{¶ 56} There came a time that Koonce investigated allegations of sexual conduct between Greene and dance students, based on reports of sexual encounters involving dance students. In 2014, based upon these reports and the school district's investigation, the district did not renew Greene's contract to continue teaching dance.

{¶ 57} On cross-examination, Koonce admitted that there was a time that the district interviewed N.S. about Greene and N.S. said that "nothing happened" between Greene and N.S. Koonce further admitted that another student's (D.J.'s) allegations against Greene were investigated by the Cuyahoga County Division of Children and Family Services and were determined to be unsubstantiated. Koonce evaluated Greene as a teacher and always rated him as a good teacher. One student gave Koonce the names of two students who could corroborate certain abuse allegations but those two students did not corroborate those allegations.

### 10. The Examination of R.C.

{¶ 58} R.C. testified that he was born in March 1984. He attended the CSA from 1996 (sixth grade) through graduation in 2002. He participated in dance classes and afterschool dance programming that Greene taught at Tri-C.

{¶ 59} There came a time during the summer between eighth and ninth grade that Greene took R.C. to Washington, D.C., to participate in a dance class and to attend a cultural parade. Greene and R.C. slept in separate beds in the same hotel room. Greene gave R.C. a massage at the hotel, during which Greene "started rubbing [R.C.'s] private area." Greene then performed oral sex on R.C.

{¶ 60} Later that summer, R.C. accompanied Greene to Cincinnati for an intensive dance program. He stayed with Greene in a condo and Greene told him that they would be sleeping in the same room. Greene performed oral sex on R.C. and the two had sexual intercourse "several times" during the week that they were in Cincinnati. R.C. described that he penetrated Greene's anus with his penis.

{¶ 61} From that point on, it became a "regular thing" that R.C. and Greene would engage in oral and anal sex, often at Greene's home. R.C. estimated that he had 20 sexual encounters with Greene.

{¶ 62} R.C. did not report these encounters until years later. He did not participate in the civil lawsuit because of the applicable statute of limitations.

{¶ 63} On cross-examination, R.C. admitted that he returned to perform at the CSA in several different shows after graduation, despite having these encounters with Greene. R.C. also taught a dance class, at Greene's request, after graduation.

### 11. The Examination of Heather Miksch

{¶ 64} Heather Miksch testified that she is employed as a Captain of the Cleveland Police Department. She supervised the sex-crimes unit in the police department from 2019 to 2022 and was involved in the investigation into these allegations.

{¶ 65} The investigation began in June 2020 when the prosecutor's office received a crime tip concerning Greene, which identified several alleged victims. One of the detectives in Miksch's unit contacted the alleged victims and several other potential witnesses to schedule interviews.

{¶ 66} Miksch testified that this matter was considered a "delayed disclosure" case, because the alleged victims did not report the alleged assaults at the time they happened. She testified that it is "pretty common" to have delayed disclosures in cases of sex crimes because "victims experience and process trauma in different ways, and many times victims are just not prepared to come forward" immediately. Children also "tend to be fearful of disclosing" sexual encounters.

{¶ 67} Law enforcement and other databases listed several addresses for Greene in the Cleveland and Dayton areas; there was also an address in Cincinnati.

{¶ 68} On cross-examination, Miksch admitted that these databases did not list any addresses in Warrensville or Richmond Heights, Ohio. Miksch further admitted that there was no DNA evidence corroborating the witnesses' testimony in this case, officers did not obtain medical records to corroborate that several of the alleged victims were HIV-positive or that E.P. attempted suicide and also that police did not obtain counseling records to corroborate that several alleged victims sought counseling for the alleged assaults. Finally, Miksch admitted that an attorney was present for the interviews police conducted with the alleged victims.

### 12. The Examination of A.W.

{¶ 69} A.W. testified that he was born in August 1993. He attended the CSA from eighth grade through graduation in 2011. In his senior year of high school, he was in the photography program. That year, he primarily took photographs of dancers and his senior thesis was a portfolio of dance photographs.

{¶ 70} There came a time that year (he estimated it was May 2011) that Greene invited A.W. to "his place" to "talk about photos and hang." Greene took A.W. to a room where there was pornography playing, depicting men engaging in sex acts with other men. Greene began "[c]aressing" and "massaging" A.W. and both people eventually disrobed. Greene offered A.W. "poppers" and "sniffed" one in front of him. Greene performed oral sex on A.W. and A.W. performed oral sex on Greene. A.W. performed anilingus on Greene and penetrated Greene's anus with his penis. Greene asked A.W. if Greene could penetrate him and A.W. said no.

{¶ 71} A.W. did not disclose this assault to anyone at the time because "it was wrong" and he was "ashamed."

{¶ 72} A.W. testified that he and Greene met for consensual sex "a few times" when A.W. was an adult, in college.

{¶ 73} A.W. eventually reported the assault to the police, sometime "during COVID." A.W. participated in the civil lawsuit involving these allegations.

{¶ 74} On cross-examination, A.W. admitted that he told a friend about the assault while he was in college.

### 13. The Defense Case

{¶ 75} The State rested at the conclusion of A.W.'s testimony. The defense then moved for acquittal on all charges pursuant to Crim.R. 29. The court denied the motion as to all counts but one. The court acquitted Greene of one count of disseminating matter harmful to juveniles, finding that the evidence introduced

about the circumstances of N.S.'s watching part of "Noah's Arc: Jumping the Broom" with Greene was insufficient to meet the elements of that offense.

{¶ 76} The defense called three witnesses. We refer to the first witness by his initials because the substance of his testimony concerned his experience at the CSA as a juvenile.

### 14. The Examination of P.F.

{¶ 77} P.F. was born in March 1987. He attended high school at the CSA, where he studied in the dance program. Greene was "like a parent inside the school." P.F. spent a lot of time with Greene both in school and after graduating. P.F. has been to Greene's home. They were routinely alone together.

{¶ 78} P.F. never saw Greene engage in any inappropriate activity. P.F. was "baffled and shocked" when he read about the allegations against Greene. Greene was a dedicated teacher and many students benefitted from studying with Greene.

{¶ 79} On cross-examination, P.F. admitted that other students did not discuss their sexuality or sexual activities with him.

### 15. The Examination of Charlene Brown

{¶ 80} Charlene Brown testified that she is employed in the dance department at Tri-C. She works on costumes, teaches etiquette and acts as a kind of mother for the students in the program. She has known Greene from his childhood. She volunteered at the CSA when Greene was a teacher there.

{¶ 81} Brown would coordinate travel and sleeping arrangements when the CSA students traveled. She would assign four students to a room. Greene slept on a different floor.

{¶ 82} Brown had never seen Greene engage in inappropriate behavior. She was "shocked" when she heard the allegations against Greene and believed the students were lying.

### 16. The Examination of DeShana Pepper Robertson

{¶ 83} DeShana Pepper Robertson testified that she is employed as the dance director at a performing-arts school in the Dayton area of Ohio. She has known Greene for approximately 35 years.

{¶ 84} Robertson and Greene worked closely together as their two performing-arts schools built a partnership wherein students from the schools would dance together and attend the same summer camps. She never saw Greene act inappropriately with any students. He was a caring and talented dance teacher.

### C. The Jury Instructions

{¶ 85} The defense rested after Robertson's testimony and renewed its Crim.R. 29 motion. The motion was denied. The court then issued its jury instructions, including the definition of "reasonable doubt." The court's specific instruction on that standard is identified below in our analysis of Greene's first assignment of error.

**D. The Verdict**

{¶ 86} The jury found Greene guilty of 16 counts of rape, 25 counts of sexual battery, 8 counts of felonious assault, 13 counts of kidnapping, 1 count of gross sexual imposition and 2 counts of disseminating matter harmful to juveniles. The jury further found that many of the kidnapping victims were under 18 years old. The jury also found that many of the offenses were committed with a sexual motivation, for purposes of that specification.

{¶ 87} The trial court found Greene guilty of the sexually violent predator specifications attached to each count. At the sentencing hearing, though, the court noted "for the record that because of the timing of certain offenses, the sexually violent predator specification on Counts 27 through 53 have been dismissed."

{¶ 88} The appendix to this opinion details the trial disposition of each of the counts in the indictment.

**E. The Sentence**

{¶ 89} The court held a sentencing hearing on June 8, 2023. Four victims addressed the court. Two parents of victims addressed the court. The State addressed the court and asked for consecutive life sentences in prison. The defense addressed the court noting that Greene maintained his innocence. Greene also addressed the court. The court then announced its sentence.

{¶ 90} The court imposed a combination of definite sentences, ranging from one to ten years, and indefinite life sentences with the possibility for parole after five, eight, or ten years.

{¶ 91} The court made the following consecutive-sentence findings:

The Court finds that a consecutive sentences [sic] is appropriate pursuant to Revised Code 2929.19(B)(2)(B) and Section 2929.14 21(C)(4). [T]he Court finds it's necessary to punish the offender; protect the public from future crime; is not disproportionate to the seriousness of the conduct and the danger posed [by] the defendant; and the harm caused is so great or unusual, that a single prison term would not adequately reflect the seriousness of the conduct.

{¶ 92} The court did not specifically explain, at the hearing, which of the sentences would be served consecutively. But it stated as follows:

Therefore, of the indefinite terms, the sentence total is life in prison, possibility of parole at 236 years. Of the 127 years in addition to the indefinite, the definite for a total of 365 years to life.

{¶ 93} The definite sentences the trial court imposed, run completely consecutively, amount to 127 years in prison (as the trial court stated). But the minimum terms on the life sentences, if run completely consecutively, would amount to 274 years in prison. Because the trial court did not state which of the sentences would be run consecutively, it is not clear from the sentencing transcript whether (1) the trial court intended to impose all the life sentences consecutively but made an arithmetic error (the minimum term would be 401 years in prison, not 365 years) or (2) intended to impose some of the life sentences concurrently but failed to state which ones would be concurrent (the minimum would be 363 years in prison, not 365).

{¶ 94} The court reduced its sentence to a journal entry, but the entry did not clarify which of the sentences would be served consecutively. The entry also did not include the consecutive-sentence findings made on the record at the hearing. The

entry stated that "[t]he court imposes a prison sentence at the Lorain Correctional Institution of 363 years to life."

{¶ 95} The trial court later entered a nunc pro tunc entry stating that it "sentenced Terence Greene to 363 years in LCI, all counts to run consecutive." There was no mention of the life sentences in that entry.

{¶ 96} Finally, the trial court entered another purported nunc pro tunc entry stating, "The court imposes a prison sentence at the Lorain Correctional Institution of 402 years to life." But because the trial court did not clearly state at the sentencing hearing which sentences it was imposing consecutively, and it is not clear from the court's arithmetic that the trial court actually imposed fully consecutive sentences, the legal effect of these "nunc pro tunc" entries is not clear.

{¶ 97} The trial court could not nunc what it did not first tunc. *State v. Williamson*, 2014-Ohio-3909, ¶ 16 (8th Dist.).

{¶ 98} Proper use of a nunc pro tunc entry is limited to correcting a clerical error in a judgment or order so that the record reflects what the court actually did or decided. *See, e.g., State v. Lester*, 2011-Ohio-5204, ¶ 18; *State ex rel. Fogle v. Steiner*, 1995-Ohio-278; *State v. Chislton*, 2021-Ohio-697, ¶ 21 (8th Dist.); *State v. Wright*, 2019-Ohio-1361, ¶ 18 (8th Dist.). A nunc pro tunc entry cannot be used to supply omitted action or to indicate what the court might or should have done or intended to do. *See, e.g., State v. Williams*, 2020-Ohio-4467, ¶ 28 (8th Dist.); *State v. Abner*, 2002-Ohio-6504, ¶ 22 (8th Dist.); *see also Chislton* at ¶ 18 ("A nunc pro tunc entry may be used only to reflect what actually happened. A nunc pro tunc

entry may not be used to 'change, modify, or correct erroneous judgments.'"),
quoting *Wright* at ¶ 18. Thus, while a nunc pro tunc entry can be used to correct a
sentencing entry to reflect the sentence the trial court actually imposed upon a
defendant at a sentencing hearing, it cannot be used to "resentence" a defendant or
to "impose a sanction that the court did not impose as part of the sentence" at the
sentencing hearing. *See, e.g.*, *State v. Smith*, 2021-Ohio-3099, ¶ 14 (8th Dist.); *State
v. Spears*, 2010-Ohio-2229, ¶ 10 (8th Dist.); *State v. Miller*, 2010-Ohio-5705, ¶ 16;
*State v. Kirby*, 2014-Ohio-5643, ¶ 35 (9th Dist.). "'When a court exceeds its power
in entering a nunc pro tunc order, the resulting nunc pro tunc order is invalid.'"
*State v. Walter*, 2017-Ohio-466, ¶ 5 (8th Dist.), quoting *State v. Senz*, 2002-Ohio-
6464, ¶ 12 (9th Dist.).

{¶ 99} Obviously, it may make no practical difference whether Greene will be
eligible for parole after serving 363 years or 402 years in prison; either is a de facto
life sentence without the opportunity for parole. But it is the trial court's duty to
carefully impose sentence and ensure the record is clear when imposing consecutive
sentences. The trial court did not do so here, and — because no party raised the
issue below or on appeal — we are constrained to leave the ambiguity unresolved at
this time. This ambiguity was not the only error in the trial court's sentencing entry.

{¶ 100} The sentencing entry did not conform to the court's orally
pronounced sentence in another way. While, at the hearing, the trial court imposed
definite prison terms on each of Counts 27, 28, 29, 30, 31, 33, 34, 36, 37, 39, 41, 46,
50 and 52, its sentencing journal entry states that the sentence on each of those

counts is a life sentence with a minimum term equal to the definite sentence imposed at the hearing. Again, the error may have no practical effect on Greene. And again, because no party raised this issue on appeal, we are constrained to leave the sentences uncorrected in this opinion.

**F. The Appeal**

{¶ 101} Greene appealed, raising the following seven assignments of error for review:

Assignment of Error 1:

The lower court erred and denied the Appellant due process and a fair trial when it expanded upon the statutory definition of reasonable doubt.

Assignment of Error 2:

The Appellant's rights to due process of law and a fair trial were violated by repeated subtle conditioning of the jury by references to the complainants as the "victims."

Assignment of Error 3:

The verdicts finding the Appellant guilty of kidnapping pursuant to R.C. 2905.01(A)(4) were against the manifest weight of the evidence.

Assignment of Error 4:

The lower court erred and denied the Appellant a fair trial as guaranteed by the Sixth Amendment to the United States Constitution when it failed in its duty to charge the jury on the offense of sexual battery as a lesser offense to all counts of rape.

Assignment of Error 5:

The verdict and judgment of the trial court finding the Appellant guilty of the sexually violent predator specification was against the manifest weight of the evidence and also based upon legally insufficient evidence and must be reversed under either theory.

Assignment of Error 6:

The lower court erred and violated the Appellant's rights pursuant to the double jeopardy clause of the United States Constitution and Section 10, Article I of the Ohio Constitution when it failed to merge kidnapping convictions with the underlying sex offenses.

Assignment of Error 7:

The Appellant was denied his Sixth Amendment right to a fair trial due to instances of ineffective assistance of counsel.

## II. Law and Analysis

### A. First Assignment of Error — Reasonable Doubt

{¶ 102} Greene contends that the trial court erred in instructing the jury on the definition of "reasonable doubt."

{¶ 103} We ordinarily review jury instructions for an abuse of discretion. *E.g.*, *State v. Howard*, 2014-Ohio-2176, ¶ 35 (8th Dist.). However, Greene did not object to the court's instructions and he has, therefore, waived all but plain error. *E.g.*, *State v. Owens*, 2020-Ohio-4616, ¶ 7, citing Crim.R. 30(A).

{¶ 104} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court notices plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 2002-Ohio-68, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Plain error "must be an 'obvious' defect in the trial proceedings" and we will not find plain error unless, but for the error, the outcome would have been different. *Barnes*; *Long* at paragraph two of the syllabus; *State v.*

*Gardner*, 2008-Ohio-2787, ¶ 78. "The burden of demonstrating plain error is on the party asserting it." *State v. Payne*, 2007-Ohio-4642, ¶ 17.

**{¶ 105}** As a general matter, a trial court must "'fully and completely give all jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the trier of fact.'" *State v. White*, 2015-Ohio-492, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus; *State v. Jay*, 74 Ohio St.3d 178, 181 (1995).

**{¶ 106}** The trial court gave the following preliminary instruction to the venire during voir dire:

> Reasonable doubt is present when after [you have] carefully considered and compared all the evidence you cannot say you're firmly convince[d] of the truth of the charge. Reasonable doubt is doubt based on reason and common sense.
>
> Reasonable doubt is not mere possible doubt because everything related to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely on it and act upon it in the most important of his or her affairs.
>
> All right. So let's — let me talk about this for a minute. In this definition reasonable doubt is based on reason and common sense. It is not mere possible doubt or imaginary doubt. It's hard to kind of come up with an example that is — has absolutely no criminal element whatsoever that you might read into, so I just from a purely — your most important affairs.
>
> How many of you have purchased a house in your lifetime? So I have purchased a house. When I purchased the house, I met the broker, met the seller and title company, did the title insurance work, okay?
> So was I legally entitled to purchase that property beyond a reasonable doubt based on that, based on title insurance, title review, brokerage statements and seller's statements that they are selling this property? Does that sound reasonable? That's what people generally do.

Now, is it possible that the seller's ex-wife from another State might have a claim on the property somewhere down the line or there is some cloud of time — that the title insurance company didn't find?  Is that possible?  Is it likely?  I mean it's remote, right?

So is it reasonable that I went forth and purchased this home?  And that's what I want you to think about.  There is a remote possibility of things, but just using your reason and common sense, when you're hearing the witness, when you're hearing, would you rely on that evidence to make an important decision in your life?

That's the standard that we're looking for, reason, common sense, not mere possible doubt.  It's not imaginary doubt, but you're using that reason and common sense is how we arrive at that, okay?

{¶ 107} After the close of evidence, the court gave the following final jury

instruction on reasonable doubt:

Reasonable doubt is present when the jurors, after they have carefully considered and compared all of the evidence, cannot say that they are firmly convinced of the truth of the charge.  It is doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt because everything related to human affairs or depending on moral evidence is open to some possible or imaginary doubt.

Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her affairs.

Okay.  So again, reasonable doubt is based on common sense and reason.  It is not mere possible doubt.  It is not imaginary doubt.  Everyone can come up with a situation to create doubt in everything in human [af]fairs.  It is doubt based on your experience, your common sense, and your reason.

I use the example of, again, just keeping out of anything criminal, the most important — would you rely on this information on the most important of your own affairs in making a decision.
I gave you the example of purchasing a house.  Is it reasonable that I rely on the seller, the broker, and the title insurance company to say

that it's — beyond a reasonable doubt I can purchase this home legally in the State of Ohio?

Now, we all kind of agree that, yes, I could, but sure there is a possible doubt that some, you know, family member — some far-distant family member can put a claim to the title, but we are only to consider what is reasonable and what does our common sense tell us is reasonable doubt, so keep that in mind as you are deliberating. That is what reasonable doubt is.

{¶ 108} The first two paragraphs of the court's instructions closely track the statutory definition of "reasonable doubt" and the Ohio Judicial Conference's pattern jury instructions.[2] *See* R.C. 2901.05(E). But the court then elaborated upon that definition, attempting to illustrate by way of example what could be considered "the most important" of a person's affairs and what proof might meet the State's burden of proof in that context.

{¶ 109} Appellate courts have cautioned that it is "inadvisable" for a trial court to attempt to expand upon the statutory definition of "reasonable doubt." *See, e.g., State v. Drake*, 1985 Ohio App. LEXIS 5894, 6–7 (8th Dist. Feb. 21, 1985). A court "going beyond the statutory definition" must "use extreme care not to

---

[2] The pattern jury instruction reads as follows:

Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

2 OJI CR 207.13.

prejudice either party." *State v. Sargent*, 41 Ohio St.2d 85, 90 (1975). Moreover, these attempts usually have minimal upside. "There is inherent difficulty in any attempt to define the abstract concept of reasonable doubt and further attempts do not usually result in making it any clearer in the minds of the jury." *State v. Van Gundy*, 64 Ohio St.3d 230, 235 (1992).

{¶ 110} We reiterate that this remains true; it was inadvisable for the trial court to have attempted to expand upon the statutory definition or the vetted and accepted Ohio Jury Instructions.

{¶ 111} That said, "'[a] reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *Jackson*, 2014-Ohio-3583, at ¶ 46 (8th Dist.), quoting *State v. McKibbon*, 2002-Ohio-2041, ¶ 4 (1st Dist.). Therefore, we proceed to consider — under the plain-error standard — whether the trial court's home-buying example clearly constituted prejudicial error.

{¶ 112} Greene argues that the trial court's instruction was confusing and "far-fetched" and "dilute[d]" the State's burden of proof. The State defends the statement as "merely . . . an example of something that could be considered one of the most important of someone's affairs"; it states that the example "did nothing to denigrate that standard, as buying a house is clearly an important affair." The State further contends that any error would be harmless in light of the "overwhelming evidence" that Greene committed the offenses.

{¶ 113} After careful consideration, we agree that any error in the court's instruction does not amount to plain error.

{¶ 114} The court's instructions accurately stated both the qualitative ("firmly convinced") and quantitative ("willing to rely and act") terms as set forth in the statutory definition of "reasonable doubt." *See Van Gundy* at 233. When looking at the instructions as a whole, we cannot say that the trial court's home-buying example clearly "could mislead the jury into finding no reasonable doubt when in fact there was some." (Cleaned up.) *Id.*

{¶ 115} We also note that Greene's convictions were supported by substantial, competent and credible evidence. Greene cannot demonstrate that the outcome of the trial would have been different but for the trial court's instruction.

{¶ 116} Greene has, therefore, failed to show plain error from the court's attempt to expound upon the statutory definition of reasonable doubt.

{¶ 117} Greene's first assignment of error is overruled.

**B. Second Assignment of Error — References to "Victims"**

{¶ 118} Greene contends that the trial court erred by referring to the alleged victims as the "victims" in front of the venire and by allowing the prosecutor and a law-enforcement witness to refer to the alleged victims as "victims" several times during the trial. Greene calls the use of the word a "subtle conditioning" toward a finding of guilt. He points out that his defense was that the alleged victims were lying and asserts that "even a couple references" to the alleged victims as "victims" prejudiced that defense.

{¶ 119} We review this assignment only for plain error because Greene did not raise this issue before the trial court. *State v. Washington*, 2023-Ohio-1667, ¶ 125 (8th Dist.).

{¶ 120} Greene complains that (1) the prosecutor called the eight witnesses who testified about inappropriate interactions with Greene as "victims" several times during the trial, (2) a State law-enforcement witness referred to one of those witnesses as a "victim" during his testimony and (3) the trial court made a passing reference to "multiple victims" during voir dire. Specifically, the trial court said the following to the venire during voir dire:

> Returning to where we last broke, I don't assume that each of you took in every single word that I said because there were a lot of them. However, I do imagine just based on watching the room that you at least understand that these are significant charges, and there were more — there were multiple victims . . . .

{¶ 121} The context of that statement was following on to the court's reading of the indictment, which refers to the alleged victims as "victims." The trial court proceeded to inquire about whether the potential jurors or their family members had been victims of crime. The trial court specifically told the jury that the indictment was "just allegations."

{¶ 122} A trial court's references to alleged victims as "victims" in front of a jury could constitute prejudicial error under some circumstances. *See State v. Almedon*, 2016-Ohio-1553, ¶ 2, 5 (10th Dist.) (equating this with "telling the members of the jury that the [alleged victims] were truthful when they claimed that sexual abuse occurred, as opposed to telling the jury [the defendant] was truthful in

his denial" and suggesting that doing so degrades the presumption of innocence); *cf. State ex rel. Panzeca v. Highland Cty. Court of Common Pleas*, 2023-Ohio-1520, ¶ 12 (Brunner, J., dissenting) ("[A]ny 'victim' must first be proved to be one. [The trial judge] has throughout the pretrial proceedings referred to the child who has made the allegations as 'the victim,' but he should not do so when conducting a jury trial.").

{¶ 123} Here, though, the trial court did not "single[] out" the testimony of the "victims" in its jury instructions or "consistently" refer to the witnesses as "victims" throughout the trial proceedings. Compare *Almedon*. The context of its passing references to "victims" during voir dire is analogous to the situation this court considered in *Washington*, 2023-Ohio-1667 (8th Dist.), wherein the trial court made one reference to the "victims" immediately after reading an indictment during voir dire. *Id.* at ¶ 132. This court found that the context made clear that the trial court was not expressing the view that crimes had occurred or that the defendant was guilty of those crimes. *Id.*

{¶ 124} Such is the case here, too. The court's reference to "multiple victims" followed immediately onto its reading of the indictment. The court was merely acknowledging the jury's patient attention during what was a lengthy reading of an indictment with many charges. The court was not expressing the view that the allegations were true or that Greene was guilty of those crimes. The court explained that an indictment merely sets forth the allegations against a defendant.

{¶ 125} Under these circumstances, we cannot say that the trial court committed plain error by making a passing reference to the alleged victims as "victims" during voir dire.

{¶ 126} As for the comments made by the prosecutor and a State witness during trial, "a prosecutor is not constrained by any . . . obligation of neutrality." *State v. Aboytes*, 2020-Ohio-6806, ¶ 189. Juries are aware that prosecutors are advocates and that "prosecutors and witnesses have biases." *Jackson*, 2023-Ohio-455, ¶ 25–26 (observing that courts have held that "a prosecutor's or a witness's use of the term 'victim' to refer to a complaining witness does not rise to the level of plain error"), citing *State v. Butts*, 2020-Ohio-1498, ¶ 41 (8th Dist.), and *State v. Madden*, 2017-Ohio-8894, ¶ 26–34 (10th Dist.).

{¶ 127} Moreover, it has been recognized that law enforcement officers frequently use the term "victim" to refer to a "complaining witness." *See Madden* at ¶ 32; *Jackson v. State*, 600 A.2d 21, 24–25 (Del. 1991).

{¶ 128} The trial court instructed the jury on the presumption of innocence and the burden of proof; it told the jury that the State's opening statement and closing argument were not evidence. Following a thorough review of the record, we find no indication that the adversarial process was undermined or that Greene was prejudiced as a result of the limited usages of the word "victim" that he identified. *See Aboytes*, 2020-Ohio-6806, at ¶ 184–196; *Palmer*, 2021-Ohio-4639, at ¶ 85–90; *Butts*, 2020-Ohio-1498, at ¶ 41.

{¶ 129} Moreover, we reiterate that Greene's convictions were supported by substantial, competent and credible evidence. Greene cannot demonstrate that the outcome of the trial would have been different but for these limited usages of the word "victim." In other words, he has not met his burden to show plain error.

{¶ 130} Greene's second assignment of error is overruled.

### C. Fourth Assignment of Error — Lesser Included Offense

{¶ 131} We address the remaining assignments of error slightly out of order. In his fourth assignment of error, Greene argues that the trial court erred when it failed to instruct the jury on the elements of sexual battery under R.C. 2907.03(A)(8). Greene failed to object to the claimed error in the instructions at trial and has waived all but plain error. *State v. Majid*, 2012-Ohio-1192, ¶ 72 (8th Dist.). Moreover, any error in the jury instructions is not plain error unless, but for the error, the outcome of the trial clearly would have been different. *Id.*

{¶ 132} A charge on a lesser included offense is only required where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. *State v. Collins*, 2011-Ohio-3241, ¶ 35 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. The court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense. *State v. Campbell*, 1994-Ohio-492. An instruction is not warranted, however, every time "some evidence" is presented on a lesser included

offense. *State v. Smith*, 2009-Ohio-2244, ¶ 12 (8th Dist.), citing *State v. Shane*, 63 Ohio St.3d 630 (1992).

> To require an instruction . . . every time some evidence, however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense.

*Id.*, quoting *Shane* at 633.

{¶ 133} A trial court has discretion in determining whether the record contains sufficient evidentiary support to warrant a jury instruction on a lesser included offense; we will not reverse that determination absent an abuse of discretion. *State v. Henderson*, 2008-Ohio-1631, ¶ 10 (8th Dist.), citing *State v. Wright*, 2002-Ohio-1462 (4th Dist.).

{¶ 134} A person commits rape in violation of R.C. 2907.02(A)(2) by "engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Greene says that a reasonable jury could have acquitted him of rape and found him guilty of sexual battery under R.C. 2907.03(A)(8), which criminalizes sexual conduct when "[t]he other person is a minor, the offender is a teacher, administrator, coach, or other person in authority employed by or serving in an institution of higher education, and the other person is enrolled in or attends that institution."

{¶ 135} Specifically, Greene argues that a reasonable jury could have found that he did not compel the victims to submit to the sexual conduct by force or threat of force. He has failed to show plain error.

{¶ 136} As an initial matter, "[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and the relation to each other." *State v. Eskridge*, 38 Ohio St.3d 56 (1988), paragraph one of the syllabus. As between a minor and a person in a position of authority, "[f]orce need not be overt and physically brutal but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id*. at 58–59, citing *State v. Martin*, 77 Ohio App. 553 (9th Dist. 1946); *State v. Wolfenberger*, 106 Ohio App. 322 (12th Dist. 1958); *see also State v. George*, 2024-Ohio-471, ¶ 38 (8th Dist.) (noting that *Eskridge*'s holding "has been extended to minor victims as old as 17"). The circumstances of this case are arguably comparable to those in *State v. Stevens*, 2023-Ohio-4683, ¶ 120–122 (6th Dist.) (sufficient evidence of forcible rape where, among other things, the defendant had "regular parent-like contact" with one minor victim and was the coach of another minor victim's baseball team), *State v. Dew*, 2009-Ohio-6537, ¶ 7–13, 114 (7th Dist.) (sufficient evidence where, among other things, a gymnastics coach "groomed and manipulated" a gymnastics student over a period of years to accept sexual demands) and *State v. Oddi*, 2002-Ohio-5926 (5th Dist.) (sufficient evidence of force where the defendant was a driving instructor who had sexual contact with minor teenaged students).

{¶ 137} Moreover, Greene did not request an instruction on sexual battery under R.C. 2907.03(A)(8) and presented a complete defense to the State's allegations at trial. He argued that the victims were all lying, having concocted false

stories of assault in order to participate in a civil lawsuit that ultimately was settled for millions of dollars. Greene focused on the lack of corroborating physical evidence and presented testimony from a student and adults who interacted with Greene over a period of years without seeing any inappropriate behavior.

{¶ 138} In other words, there were two separate and distinct scenarios presented to the jury at trial: (1) the State's version, in which Greene forcibly raped and otherwise sexually assaulted the victims, taking advantage of his position of authority and (2) Greene's version, in which he never engaged in sexual acts with the victims. If the jury accepted Greene's version, it would be a complete defense to all the charges.

{¶ 139} We are convinced that, considering the evidence presented and Greene's trial defense, any error in the court's decision not to instruct on the elements of sexual battery under R.C. 2907.03(A)(8) is not plain error that we should choose to recognize. *See State v. Wilkins*, 64 Ohio St.2d 382, 389 (1980) ("The jury . . . had to choose between a complete defense, and therefore acquittal, or the commission of the crime of rape. Under these facts the trial court did not err in failing to charge the jury on the crime of sexual battery."); *State v. Parker*, 2022-Ohio-377, ¶ 26 (8th Dist.).

{¶ 140} We, therefore, overrule Greene's fourth assignment of error.

## D. Fifth Assignment of Error — SVP Specification

{¶ 141} Greene argues that the trial court's finding that he was a sexually violent predator was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 142} A sexually violent predator "means a person who . . . commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). The legislature set forth factors that "may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses," as follows:

(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

R.C. 2971.01(H)(2).

{¶ 143} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.). The relevant inquiry in a sufficiency challenge is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The court examines all the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *State v. Williams*, 2023-Ohio-2296, ¶ 81 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52 (Cook, J., concurring); *see also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 144} In contrast to a challenge based on sufficiency of the evidence, a manifest-weight challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial. *See State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.).

{¶ 145} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether; in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 146} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g.*, *State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

{¶ 147} Moreover, a conviction may rest solely on the testimony of a single witness, including the alleged victim, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g.*, *Washington*, 2023-Ohio-1667, at ¶ 119 (8th Dist.); *Williams*, 2023-Ohio-2296, at ¶ 87 (8th Dist.); *State v. Nicholson*, 2022-Ohio-2037, ¶ 180 (8th Dist.); *State v. Jones*, 2020-Ohio-3367,

¶ 71 (8th Dist.); *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 38 (8th Dist.). This includes cases that involve allegations of rape or other forms of sexual assault. *See, e.g., State v. Williams*, 2023-Ohio-1748 ¶ 35–36 (8th Dist.); *State v. Black*, 2019-Ohio-4977, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, ¶ 84 (4th Dist.).

{¶ 148} Here, available evidence suggests that Greene chronically committed offenses with a sexual motivation. Moreover, other relevant evidence supports the conclusion that Greene is likely to engage in the future in more sexually violent offenses.

{¶ 149} Greene is alleged to have groomed and assaulted eight dance students over the course of two decades. His methodology was consistent: he would target older teenaged male students, beginning by discussing their bodies and their ideas of their own sexuality with them. He would encourage them in their artistic endeavors, often promising dance opportunities or to help them develop new skills or otherwise advance their artistic pursuits. He would cultivate a sense of trust in the students and their families and then take advantage of that trust when he was alone with the students, often beginning with sexual comments and proceeding toward fondling, then oral sex, then penetrative sex. He engaged in penetrative sex with teenaged students despite knowing that he was HIV-positive. He offered several students intoxicating substances and showed several students pornography. At least two victims — R.C. and R.A. — estimated that these assaults occurred dozens of times. Greene told several victims not to tell anyone about their sexual interactions.

{¶ 150} When viewed in the light most favorable to the State, the evidence presented at trial was sufficient for a rational finder of fact to conclude that Greene committed sexually violent offenses and was likely to engage in the future in more sexually violent offenses.

{¶ 151} That finding was not against the manifest weight of the evidence. Greene pointed out certain inconsistencies in the State's case at trial and on appeal. N.S. was adamant that he watched the "Noah's Arc" film in May 2008, but the defense pointed out that the movie had not yet been released at that time. Brown denied that she ever provided a card to N.S. on Greene's behalf, despite N.S. testifying that she did so.

{¶ 152} We note that the victims did not immediately report these assaults and seemingly reported the assaults to police only after consulting with a civil attorney about the possibility of pursuing a civil lawsuit. Many of the victims continued interacting with Greene after their graduation. Koonce testified that CSA's initial investigation led CSA to conclude that another student's allegations against Greene (not one of the testifying victims) were unsubstantiated. Moreover, N.S. initially told Koonce that "nothing happened" between Greene and N.S. Finally, Brown testified as to the sleeping arrangements during school trips and she, two other adult professionals and a former student all testified that they witnessed no inappropriate behavior between Greene and students.

{¶ 153} "[A] conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony." *State v. Wade*, 2008-

Ohio-4574, ¶ 38 (8th Dist.).  Greene argued his defense to the jury and the trial court and the factfinders were free to reject any portion of the State's evidence or witness testimony that was inconsistent or otherwise unbelievable.  The factfinders chose to believe the victim–witnesses.  The victims' testimony about interactions with Greene was largely consistent.

{¶ 154} After a careful review of the record, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that the trier of fact's finding that Greene is a sexually violent predator must be reversed.

{¶ 155} We, therefore, overrule Greene's fifth assignment of error.

**E. Third and Sixth Assignments of Error — Kidnapping**

{¶ 156} In the third assignment of error, Greene contends that his convictions for kidnapping were against the manifest weight of the evidence.  In his sixth assignment of error, he argues that all of his convictions for kidnapping should have merged with other offenses.  The kidnapping convictions are not against the manifest weight of the evidence, but we agree with Greene's merger argument as to several of his kidnapping convictions.

{¶ 157} A person commits kidnapping by — through force, threat, or deception — removing another person from the place where the other person is found or restraining the liberty of the other person, for the purpose of engaging in sexual activity with the victim against the victim's will.  R.C. 2905.01(A)(4).

{¶ 158} Greene's argument as to manifest weight is essentially that the evidence supports a conclusion that Greene's stated reasons for causing the victims to be in his home, in a dressing room or in his hotel room were legitimate and "the motivation for sexual conduct came about after the movement." He also argues that, with respect to some of the alleged encounters, the victims went with Greene willingly for the purpose of engaging in sexual activity. We disagree.

{¶ 159} As discussed above, the evidence established that Greene engaged in a pattern of calculated grooming with respect to the victims. After gaining the victims' trust he would manufacture opportunities to be alone with the victims — almost always, at first, through deception (putting music together for a show, working on costumes and learning a new dance, as but three examples). He would dole out or withhold artistic opportunities and praise based on how receptive the students were to his advances. He would then restrain the liberty of the victims while engaging in the sexual activity with them.

{¶ 160} Greene argued his defense to the jury and the jury chose to believe the victims. After careful consideration of each of the kidnapping convictions, we cannot say that this is an exceptional case where the jury lost its way in returning guilty verdicts on those offenses. Greene's third assignment of error is, therefore, overruled. We turn now to his merger argument.

{¶ 161} R.C. 2941.25, Ohio's allied-offenses statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment

or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 162} Greene did not object to the court's merger decisions at the sentencing hearing, and we therefore review the sixth assignment of error for plain error. *State v. Rogers*, 2015-Ohio-2459, ¶ 3. To show plain error, Greene "has the burden to demonstrate a reasonable probability that the convictions are for allied offenses of similar import committed with the same conduct and without a separate animus." *Id.*

{¶ 163} In determining whether offenses are subject to merger for sentencing under R.C. 2941.25, courts evaluate three separate factors — the import, the conduct and the animus. *State v. Ruff*, 2015-Ohio-995, paragraphs one and three of the syllabus. Offenses do not merge, and a defendant may be convicted of and sentenced for multiple offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately or (3) the offenses were committed with separate animus or motivation. *Id.* at paragraph three of the syllabus, ¶ 25, 31. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 2013-Ohio-4982, ¶ 18;

*see also State v. Davids*, 2022-Ohio-2272, ¶ 43 (8th Dist.); *State v. Burey*, 2021-Ohio-943, ¶ 17 (8th Dist.).

{¶ 164} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Thus, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26. "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Id.*

{¶ 165} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "'one offense was complete before the other offense occurred, . . . notwithstanding their proximity in time and that one [offense] was committed in order to commit the other.'" *State v. Woodard*, 2022-Ohio-3081, ¶ 38 (2d Dist.), quoting *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). Thus, "'when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts.'" *Woodard* at ¶ 38, quoting *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.).

{¶ 166} For purposes of R.C. 2941.25(B), animus has been defined as "'"purpose or more properly, immediate motive."'" *State v. Priest*, 2018-Ohio-5355, ¶ 12 (8th Dist.), quoting *State v. Bailey*, 2014-Ohio-4684, ¶ 34 (8th Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 131 (1979). "'If the defendant acted with the same

purpose, intent, or motive in both instances, the animus is identical for both offenses.'" *State v. Lane*, 2014-Ohio-562, ¶ 12 (12th Dist.), quoting *State v. Lewis*, 2012-Ohio-885, ¶ 13 (12th Dist.). "Animus is often difficult to prove directly but must be inferred from the surrounding circumstances." *Lane* at ¶ 12, citing *State v. Lung*, 2012-Ohio-5352, ¶ 12 (12th Dist.).

{¶ 167} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct" and "an offense may be committed in a variety of ways." *Ruff*, 2015-Ohio-995 at ¶ 26, 30. "[T]his analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct — an inherently subjective determination." *Ruff* at ¶ 32, quoting *State v. Johnson*, 2010-Ohio-6314, ¶ 52 (plurality opinion per Brown, C.J.).

{¶ 168} With respect to the offenses of rape and kidnapping, the Ohio Supreme Court has acknowledged that "implicit within every forcible rape . . . is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Asadi-Ousley*, 2017-Ohio-7252, ¶ 38 (8th Dist.), citing *State v. Logan*, 60 Ohio St.2d 126, 130 (1979). In *Logan*, the Court provided the following guidelines for determining whether kidnapping and a sex offense are allied offenses that should merge prior to sentencing, stating:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint

is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.[3]

{¶ 169} Applying these guidelines, the Ohio Supreme Court held in *Logan* that the offender's conduct in forcing the victim into an alley before raping her at knife point was committed without a separate animus. The Court found that the movement was slight, the detention brief and the victim was released immediately after the commission of the underlying crime, compelling the Court's conclusion that the kidnapping was incidental to the rape. *Id*. at 135.

{¶ 170} In the case before us, the trial court determined that the kidnapping and rape offenses did not merge. It reasoned as follows:

The Court makes a further finding that kidnapping, rape and felonious assault do not merge, they are separate offenses, they have separate motivations. The kidnapping involving luring children to either a home, apartment or on a trip is a separate crime from rape. And the felonious assault is separate to that, even though infection may have come as a result of the rape, infecting with HIV is a separate charge, so these charges [don't] merge.

---

[3] Although the "two-step" allied offense analysis prescribed by the Supreme Court in *Logan* has been overruled, the Court's discussion of animus remains relevant under the current tripartite test prescribed in *Ruff*. *See, e.g., State v. Lundy*, 2017-Ohio-9155, ¶ 26 (8th Dist.) ("Although *Logan* predates *Ruff*, Ohio courts continue to apply the guidelines set forth in *Logan* to determine whether . . . offenses were committed with a separate animus, in accordance with the third prong of the *Ruff* test.").

{¶ 171} We agree with the trial court's merger decision with respect to those kidnapping offenses that involved Greene luring or forcing victims to accompany him to his home or to stay with him in his hotel room during travel. We disagree with respect to those kidnapping offenses that involved Greene performing sex acts with students in a dressing room at the school. The evidence supports a conclusion that the latter category of kidnapping offense was incidental to the related sexual offenses.

{¶ 172} As to the offenses that occurred during travel or at Greene's home, we find that Greene brought the victims to his home or hotel room for the purpose of engaging in sexual acts with them. In each instance, Greene caused school-aged children to leave the relative safety of their school (and with respect to the travel, their home cities) for the purpose of making sexual advances and ultimately engaging in sexual activity with them. We find this movement substantial enough and confinement secretive enough that the kidnapping demonstrated a significance independent of the other sex offenses. Further, we find that the victim's restraint during these encounters subjected them to a substantial increase in risk of harm separate and apart from that involved in the sex offenses..

{¶ 173} The same cannot be said for the offenses that occurred in the school dressing room. The evidence supported a conclusion that the dressing room was minimally separated from other common areas of the school. While Greene restrained the victims in the dressing room to facilitate the sex offenses, the restraint

was incidental to the sex offenses and Greene released the victims immediately after committing the sex offenses.

{¶ 174} Therefore, it was plain error for the trial court to have failed to merge the following offenses:

- Count 1 (forcible rape) and Count 4 (kidnapping) [oral sex with R.A. in a school dressing room]

- Count 23 (forcible rape) and Count 26 (kidnapping) [oral sex with R.A. in a school dressing room]

{¶ 175} The sixth assignment of error is therefore sustained, in part, and overruled in part. We vacate the convictions on Counts 1, 4, 23 and 26 and remand this matter for the trial court to conduct a limited resentencing hearing, at which the State must elect the offenses to which the court shall proceed to sentencing.

## F. Seventh Assignment of Error — Ineffective Assistance of Counsel

{¶ 176} Greene argues that his trial counsel was ineffective in the following ways: (1) failing to object to the trial court's instruction on reasonable doubt, (2) failing to object to the references to the alleged victims as the "victims" during voir dire and during the trial, (3) failing to request an instruction on the elements of sexual battery under R.C. 2907.03(A)(8) and (4) failing to request that the kidnapping offenses merge with other offenses.

{¶ 177} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result

of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Id.*

{¶ 178} In evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.).

{¶ 179} As a general matter, defense counsel's tactical decisions and trial strategies — even "debatable" ones — do not constitute ineffective assistance of counsel. *See, e.g.*, *Black*, 2019-Ohio-4977, at ¶ 35 (8th Dist.); *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.); *see also State v. Conway*, 2006-Ohio-2815, ¶ 101, 111. Reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial," even where trial counsel's strategy was "questionable" and even where appellate counsel argues that they would have defended against the charges differently. *State v. Myers*, 2002-Ohio-6658, ¶ 152; *State v. Mason*, 1998-Ohio-370; *State v. Quinones*, 2014-Ohio-5544, ¶ 25 (8th Dist.).

{¶ 180} As for counsel's alleged failure to object to the court's definition of "reasonable doubt," Greene has failed to show that the result of the trial would have been different had his counsel objected. As discussed above, the court's definition

of "reasonable doubt" accurately stated both the qualitative ("firmly convinced") and quantitative ("willing to rely and act") terms as set forth in the statutory definition of "reasonable doubt" and Greene's convictions were supported by substantial, competent and credible evidence.

{¶ 181} As for counsel's alleged failure to object to the references made to "victims" during the proceeding, whether to object to statements made in the presence of the jury is often regarded as a strategic or tactical decision. *See, e.g.*, *State v. Frierson*, 2018-Ohio-391, ¶ 25 (8th Dist.). As such, the failure to make an objection is generally not, in and of itself, sufficient to sustain a claim of ineffective assistance of counsel. *Conway*, 2006-Ohio-2815, at ¶ 103; *Frierson* at ¶ 25; *Black*, 2019-Ohio-4977, at ¶ 35 (8th Dist.); *see also State v. C.D.S.*, 2021-Ohio-4492, ¶ 109 (10th Dist.) (observing that "[i]t is . . . conceivable that defense counsel did not want to bring further attention to the issue as part of the trial strategy by insinuating appellant did not trust the jury's ability to identify the word 'victim' as a reference to a complaining witness").

{¶ 182} Here, we find that counsel's decision not to object was a tactical decision. Considering the passing nature of the remarks and understanding that juries understand the biases of prosecutors and law enforcement, counsel may not have wanted to draw further attention to the matter. Moreover, counsel may not have wanted to be seen as making unreasonable objections.

{¶ 183} As for counsel's alleged failure to seek an instruction on the elements of sexual battery under R.C. 2907.03(A)(8), that was also a tactical decision.

Counsel seems to have thought that the lack of corroborative physical evidence, combined with the existence of the civil lawsuit, the testimony of defense witnesses and the failures the defense saw in the State's investigation, would lead the jury to disbelieve the victims in their entirety. Greene presented an absolute defense to the charges and he sought a complete acquittal. We consider the decision not to seek a lesser-included-offense instruction to be a tactical decision, one we will not second guess on appeal.

{¶ 184} With respect to counsel's alleged failure to object to the trial court's merger decisions, such an objection would have been meritless as to most of the offenses, for the reasons discussed above. To the extent that counsel was ineffective for failing to request the merger of the two kidnapping offenses stemming from offenses in a dressing room, we find that this court's resolution of the sixth assignment of error adequately addresses that failure.

{¶ 185} We, therefore, overrule Greene's seventh assignment of error.

## III. Conclusion

{¶ 186} Having sustained Greene's sixth assignment of error, in part, we vacate his convictions on Counts 1, 4, 23 and 26. We remand this matter and instruct the trial court to conduct a limited resentencing hearing, at which the court must merge those offenses as follows:

- Counts 1 and 4 merge.

- Counts 23 and 26 merge.

{¶ 187} At the resentencing hearing, the State must elect — as to each pair of offenses identified above — the offense to which the court shall proceed to sentencing. The trial court must then accept the State's choices and impose lawful sentences on those offenses.

{¶ 188} Having overruled Greene's other assignments of error for the reasons stated above, we affirm the judgment in all other respects.

The court finds there were reasonable grounds for this appeal.

It is ordered that the appellant and appellee share the costs herein taxed.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
MARY EILEEN KILBANE, J., CONCUR

## APPENDIX

| Count | Charge (as indicted) | Specifications (as indicted) | Trial Disposition | Sentence (as pronounced at the hearing)[4] |
|---|---|---|---|---|
| **Offenses against R.A.** | | | | |
| 1 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 2 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 1* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 3 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 4 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 5 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

---

[4] As discussed above, the trial court erroneously stated in its sentencing journal entry that the sentence on each of Counts 27, 28, 29, 30, 31, 33, 34, 36, 37, 39, 41, 46, 50 and 52, is a life sentence with a minimum term equal to the definite sentence imposed at the hearing.

| | | | | |
|---|---|---|---|---|
| 6 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 5* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 7 | Felonious assault (R.C. 2903.11(B)(3))  *(no specifications)* | | Guilty | Life imprisonment, stated minimum of 8 years |
| 8 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| **Offenses against N.S.** | | | | |
| 9 | Gross sexual imposition (R.C. 2907.05(A)(1))  *(no specifications)* | | Guilty | 1 year in prison |
| 10 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 11 | Disseminating matter harmful to juveniles (R.C. 2907.31(A)(1)) | | Dismissed[5] for insufficient evidence pursuant to Crim.R. 29 | |
| **Offenses against E.P.** | | | | |
| 12 | Sexual battery (R.C. 2907.03(A)(7)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |
| 13 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

---

[5] The journal entry documenting the verdict and the sentencing journal entry erroneously state that "the jury returned a verdict of guilty" on this count. The court announced at the sentencing hearing that this was an error and that this count was dismissed. The sentencing journal entry, while retaining the error, also states that "Count #11 has been dismissed."

| | | | Verdict | Sentence |
|---|---|---|---|---|
| 14 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 15 | Sexual battery (R.C. 2907.03(A)(7)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |
| 16 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty[6] | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 17 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 18 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 19 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 20 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

---

[6] The trial court did not announce the jury's finding on this specification during the trial, but its journal entry notes that the jury convicted Greene of the specification and no party indicated a disagreement about that fact in this appeal.

| | | | | |
|---|---|---|---|---|
| 21 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 22 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 23 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 24 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 23* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 25 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 26 | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| Offenses against S.R. | | | | |
| 27 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | 5 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |

| | | | |
|---|---|---|---|
| 28 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | 5 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 29 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | 5 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 30 | Kidnapping (R.C. 2905.01(A)(4)) | | Guilty | 10 years in prison |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 31 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 32 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 31* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 33 | Kidnapping (R.C. 2905.01(A)(4)) | | Guilty | 10 years in prison |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |

## Offenses Against R.C.

| | | | |
|---|---|---|---|
| 34 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |
| 35 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 34* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed |

| | | | | |
|---|---|---|---|---|
| 36 | Kidnapping (R.C. 2905.01(A)(4)) | | Guilty | 10 years in prison |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 37 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 38 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 37* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 39 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 40 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 39* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 41 | Kidnapping (R.C. 2905.01(A)(4)) | | Guilty | 10 years in prison |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 42 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |

| 43 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 42*[7] |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 44 | Rape (R.C. 2907.02(A)(2)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |
| 45 | Sexual battery (R.C. 2907.03(A)(7)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |
| 46 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 47 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 46* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 48 | Rape (R.C. 2907.02(A)(2)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |
| 49 | Sexual battery (R.C. 2907.03(A)(7)) | | Not Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |

---

[7] When announcing its sentence on the offenses against this victim, the trial court did not explicitly state that Count 43 merged into Count 42. However, the court previously announced its finding that "where the counts of rape and sexual battery are committed as part of the same act, those offenses will be merged." Moreover, its sentencing journal entry clearly states that Count 43 merged into Count 42. No party raises any error in this appeal related to merger or challenges this court's jurisdiction over the appeal.

| 50 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 51 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 50* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 52 | Rape (R.C. 2907.02(A)(2)) | | Guilty | 10 years in prison |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| 53 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 52* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Dismissed | |
| Offenses against J.B. | | | | |
| 54 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 55 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 54* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 56 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

| Count | Offense | Specification | Verdict | Sentence |
|---|---|---|---|---|
| 57 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 56* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 58 | Felonious assault | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 59 | Kidnapping (R.C. 2905.01(A)(4)) *(no specifications)* | | Guilty | Life imprisonment, stated minimum of 10 years |
| **Offenses against A.W.** | | | | |
| 60 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 61 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 60* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 62 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 63 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 62* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

| | | | | |
|---|---|---|---|---|
| 64 | Rape (R.C. 2907.02(A)(2)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 65 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | *Merged into Count 64* |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 66 | Disseminating matter harmful to juveniles (R.C. 2907.31(A)(1)) | | Guilty | 1 year in prison |
| 67 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 68 | Kidnapping (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| Offenses against John Doe 8 | | | | |
| 69 | Gross sexual imposition (R.C. 2907.05(A)(1)) *(no specifications)* | | Voluntarily dismissed by the state, nolle prosequi | |
| 70 | Kidnapping (R.C. 2905.01(A)(4)) | | | |
| | | Sexual motivation (R.C. 2941.147(A)) | Voluntarily dismissed by the state, nolle prosequi | |
| | | Sexually violent predator (R.C. 2941.148(A)) | | |

| Offenses against D.T. | | | | |
|---|---|---|---|---|
| 71 | Sexual battery (R.C. 2907.03(A)(7)) | | Guilty | Life imprisonment, stated minimum of 5 years |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 72 | Disseminating matter harmful to juveniles (R.C. 2907.31(A)(1)) | | Guilty | 1 year in prison |
| 73 | Felonious assault (R.C. 2903.11(B)(3)) | | Guilty | Life imprisonment, stated minimum of 8 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |
| 74[8] | Kidnapping; furthermore, victim was under 18 years old (R.C. 2905.01(A)(4)) | | Guilty | Life imprisonment, stated minimum of 10 years |
| | | Sexual motivation (R.C. 2941.147(A)) | Guilty | |
| | | Sexually violent predator (R.C. 2941.148(A)) | Guilty | |

---

[8] The trial court misspoke when announcing this sentence at the hearing; it called this "Count 75." There was no seventy-fifth count in the indictment and it was clear from context that the court was announcing the sentence for Count 74. Again, no party raises an error in this appeal related to this mistake.